## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

TIMOTHY PAUL TAYLOR
6040 Sayward Drive
Newburgh, Indiana 47630

       *and*

TPTFILMS ENTERTAINMENT, LLC,
6040 Sayward Drive
Newburgh, Indiana 47630

       Plaintiffs,

v.

SCHALET R. JACKSON,
1404 State Route 235
Ada, Ohio 45810

       *and*

Knight's End The Series, LLC,
c/o its Registered Agent
Schalet Jackson
1404 State Route 235
Ada, Ohio 45810

       *and*

Austin Buttars,
5713 Shannon Heights Blvd.
Dublin, Ohio 43016-4193

       *and*

Richardson Law LLC
6059 Frantz Road, Suite 201
Dublin, Ohio 43017

       Defendants.

Case No._____

Jury Trial Demanded

## COMPLAINT FOR MONETARY DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

It was tragic enough for filmmaker Timothy Paul Taylor and his family when, after years of directing and producing significant works for others earned him a $500,000 investment in his decades-long passion project, his health problems worsened, consigning him to a hospital in his wife's native Brazil. What followed, as  Taylor lay confined by doctors' orders to his bed, was worse.

As Taylor languished in a hospital, an unscrupulous actress, Schalet Jackson, in concert with her attorneys, one of whom would soon be convicted of theft and suspended from practicing law, exploited the invalid's illness to hack his accounts, seize his footage, and extort ownership of the passion project he created decades before she decided (at the age of 40) in 2013 to become an actress.  As Taylor's donor kidney function decreased, his doctors told him to avoid stress, but Jackson set out to plunder his creation for herself, and transform the opportunity Taylor had given her, and her limited seed investment in an investor focused proof-of-concept pilot into outright ownership of a sweeping series project that Taylor had been developing for years.

Jackson hired a lawyer and hacked and deleted Taylor's sensitive project-development communications, seized and impounded his footage and data, and held his intellectual property hostage to extort an assignment of Taylor's creation for her exclusive copyright exploitation.  As she systematically discredited Taylor's project, alienated its investors, and destroyed its value in pursuit of un-bargained-for and unprecedented personal gain, Jackson falsely marketed herself online—under Taylor's project-related trademarks—as its owner and promising producer.  And in concert with her lawyers, she pursued an accounting and contract action in state court—which

2

lacks jurisdiction over her putative copyright claims—as an end-run to obtain instant and full returns on the proof-of-concept pilot she invested in, but was Taylor's crowning work

Meanwhile, not content to resort to her limited, state-law contract and corporation law remedies to recoup her seed investment in the focused pilot, Jackson and her attorneys waged a separate and unlawful war, continuing their course of criminally sanctionable conduct separate and apart from their lawsuit to achieve what they could not in state court, resorting to extortion, theft, deceit, and force to assert a wholesale claim of "ownership" over Taylor's creation itself.

By this action, Taylor seeks a declaration that Jackson owns no exclusive copyright interest in his script and its derivative materials because the intellectual-property rights he holds by law are his.  He also seeks the immediate return of his unlawfully impounded intellectual property, an injunction against Jackson's continuing use of his creation to trade on his name and works, and all remedies available at law for the harm that Jackson and her lawyers have caused Taylor, his company, and his project in their gambit to profit from his cinematic art.

## PARTIES

1.      Plaintiff Timothy Paul Taylor ("Taylor") has worked in the television and film entertainment industry for over 25 years as an artist, actor, writer, manager, producer, and director, with over 30 film and television credits to his name.   Taylor is the owner and sole member of TPTFILMS Entertainment LLC (collectively "Plaintiffs"), a resident of his wife's native Brazil, and has created works in numerous cities and states, for distribution around the world.

2.       Taylor is the author, creator, publisher, and producer of The Knight's End television series and ensuing derivative works therefrom ("*Knight's End*").  *Knight's End* is a passion project based on a script Taylor authored and placed on the Writers Guild registry in

3

August 2017, and he has devoted the last four years of his life to developing and securing investors for the project,  culminating in a $500,000 letter of intent from an investment consortium to develop *Knight's End* as a full-length scripted series for a household-name global streaming platform.

3.     Plaintiff TPTFILMS Entertainment LLC ("TPTFILMS") is a production company based and incorporated in Indiana, with over 10 production credits in feature films and scripted television between January 2013 and the present. Taylor is its sole member.

4.     Defendant Schalet Jackson is an individual residing at 1404 State Route 235, Ada, Ohio 45810, who began her acting career in 2013, at the age of 40. She has performed as an actress in Christian-interest projects and several low-budget, straight to video or limited release short films and television series.  She has never produced a major feature film, a network television series, or an episode of such a series, and has no experience leading the production of any scripted entertainment.

5.     Nonetheless, after volunteering herself as a candidate for a recurring role in *Knight's End: Intus*, Jackson held herself out to Taylor as a trustworthy and experienced seed-investor, invoking their shared faith, and requested to serve as line-producer for a single-episode proof-of-concept pilot based on her claimed "industry background."  She holds no exclusive intellectual-property rights in any intellectual property associated with the Knight's End franchise project *Knights' End Series or Knight's End: Intus*, but claims otherwise online, where she maintains an active social-media presence and markets herself as an aspiring producer who became a Producer on the *Knight's End: Intus* proof-of-concept pilot and "wants to change the world."

4

6.      Defendant Knight's End the Series, LLC (the "Jackson Company") is an Ohio limited liability company with its principle place of business in Ada, Hardin County, Ohio. Jackson is the sole member of the Jackson Company, which she formed in 2017 with an internet legal-form vendor, but without contractual or prior agreement or assets from the Plaintiffs. The Jackson Company holds no assets other than those contributed by  Jackson, and no intellectual-property assets.

7.      Until his license was suspended for an interim period on June 4, 2019, following his conviction for felony theft, Defendant Austin Buttars was a partner in the firm Buttars, Richardson, & Snyder, where Jackson engaged him as her attorney. On information and belief, Buttars assured Jackson that he could obtain both rights and title to *Knights End*, and their attorney-client relationship was formed to pursue that end, notwithstanding  Buttars' knowledge as an attorney that  Jackson held no colorable ownership claim to *Knights End* and its materials.

8.       On February 13, 2018, a week after Jackson unlawfully hacked Taylor's production-company drive, after previously stealing all principal-photography footage of Taylor's shooting script for the *Knight's End: Intus* proof-of-concept pilot, and removing Taylor's access to his materials stored on a cloud drive, Buttars filed a putative accounting, fraud, breach of contract, and unjust-enrichment action on Jackson's behalf in state court.

9.      On information and belief, including because Buttars demanded that Taylor assign his *Knights End* intellectual property to Jackson as a condition of withdrawing a sham lawsuit, and filed public allegations that Butters knew well would destroy the marketability of a mid-production series to distributors, Buttars and his firm were aware of and encouraged Jackson's criminal and tortious acts, and knowingly and materially aided her attempt to steal

Taylor's life's work—a promising, profitable series that had already attracted *bona fide* investors—for herself.

10.      On information and belief, Richardson Law LLC (the "Firm") is a legal-services company based in Dublin, Ohio, and the successor-in-interest to Buttars, Richardson, & Snyder. The knowledge of its principals is attributed to it, and on information and belief, including from Jackson, Buttars, and its inherited work-product, the Firm has both constructive and actual knowledge of the unlawful acts and meritless claims it has facilitated on Jackson's behalf. Nonetheless, the Firm has continued litigating against Taylor for over two years, even as his chronic kidney failure and associated health problems have progressed to life-threatening status.

## JURISDICTION AND VENUE

11.      Plaintiffs repeat, reallege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

12.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1030, 2707, 17 U.S.C. § 101 et seq., 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1332, 1338, and 1367, as well as the Declaratory Judgment Act, 28 U.S.C. § 2201.

13.      Upon information and belief, Defendants reside in Ohio and have systematically and continuously availed themselves of the privilege of doing business in Ohio to exploit Taylor's intellectual property, including by prosecuting a frivolous, civil state-court action against Taylor to the present, as set out herein.

14.      Defendants have sufficient contacts with this District, both generally and specifically in connection with the facts alleged in this Complaint, such that this Court has personal jurisdiction over each and all of the Defendants.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 because Defendants conduct business and/or reside in this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

### BACKGROUND AND FACTS.

16.     Plaintiffs repeat, reallege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

17.     This action is brought by Taylor and TPTFILMS seeking monetary damages and declaratory and injunctive relief against the Defendants for accessing, misappropriating, impounding, compromising, damaging, and refusing to return data stolen from a cloud drive and database containing Plaintiffs' intellectual property related to Plaintiffs' creation and production of *Knight's End*: *Intus* for development as a multi-episode television series, hijacking Plaintiffs' Twitter and Instagram accounts, and hacking Taylor's private Gmail account and deleting Plaintiffs' intellectual property therein by digital force, in violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*

18.     Defendants violated those statutes by unlawfully accessing Taylor's private email and Plaintiffs' social media accounts, accessing and misappropriating an electronic storage system without authorization, and obstructing and withholding access to Plaintiffs' own accounts and *Knight's End* project data. To the present day, despite repeated notice that their actions are, quite simply, textbook violations of federal law, Jackson and her attorneys have continued to obstruct, impound, and withhold access to the seized hard drive, online accounts and *Knight's End* materials.

19.     These violations are not mere formalities.  Entertainment projects are most vulnerable when their creators shop them to investors, who know that there are no guaranteed profits for even the most promising productions, and will often withdraw from projects at the hint of even meritless litigation, which can jeopardize the timing, clearance, and other prerequisites necessary to produce and distribute a narrative work in the global market for scripted entertainment.

20.     Screenwriters and producers, in particular, stand or fall by social media. As Plaintiffs have stressed in their many attempts to address Defendants' conduct without litigation, Jackson and her lawyers have crippled Plaintiffs' ability to produce, market, and sell the *Knights End* project, including by hijacking two of the platforms by which they communicate with their substantial fan base during a critical period in the investor-stage promotion of the project.

21.     As Defendant Jackson has made plain, that is precisely what she intended.  The seizures were a deliberate, calculated attempt by Defendants to extort substantial sums of money from Taylor, and for both Jackson and her attorneys to profit from his promising creation.

22.     Taylor had been working on *Knights End* for over twenty years by the time Jackson sought to perform in it. In 1995, after a few years of experience and education he began writing the underlying work that was the influence for the *Knight's End* pilot.  For more than twenty years, as his career in TV and film-production began to be noteworthy, Taylor continued working diligently on his passion project, researching its historical context, developing its narrative, creating its characters, and conceptualizing the story and message he wanted to share with the world.

23.     Taylor's recognition in the industry gave him the experience and contacts necessary to launch a significant project of his own, and by 2016, he was confident he could

8

attract enough investment to fully realize *Knights End*.  Between February 2014 and July 2016,
Taylor wrote an original *Knights End* screenplay.  Afterwards he worked with his associate to
polish the *Knight's End: Intus* pilot screenplay and registered it on August 9, 2017 with the
Writers Guild of America West ("WGA") under Registration No. 1908774 (the "Script").
Defendant Jackson made no contribution whatsoever to the Script, any subsequent shooting
script or any of Taylor's underlying creative work.

24.     In 2015, Taylor met Jackson briefly for the first time at a workshop that he hosted
in Evansville, Indiana.  Over a year later, in late August of 2016, as an aspiring actress, Jackson
expressed interest in being an actress for a pilot episode of *Knight's End: Intus*.  In the summer
of 2017, she expressed interest in joining the production as an Associate Producer.  In September
2017, Jackson was made a Producer on the project after she offered to manage the business side
of the pilot development while Taylor handled the creative side.  No contracts or agreements
were ever put in writing and signed by the parties reflecting their arrangement.

25.     Previously, through years of hard work and talent in the entertainment industry,
Taylor built a network of investors and was able to use those connections to secure investments
in the production of the *Knight's End* project. Taylor informed Jackson about the existence of
these investors and that none of their funds could be released until they completed the proof-of-
concept pilot that would encourage investors belief in the ability of the team to execute a serious
production, which would engage audiences in the faith, family and action genres.

26.     Still with no contracts in place, on September 14, 2017, Jackson took it upon
herself to form a limited liability company, Knights End the Series LLC (the "Jackson
Company"), using an online legal filing tool and unilaterally identifying Taylor as a member on

the LLC incorporation paperwork without his prior consent or signature and taking on a line of

credit and/or personal credit card debt in order to invest in the production of a pilot.

27.     Thereafter, on November 22, 2017, Jackson purported to sign a LLC operating

agreement, which stated that Jackson and Taylor were 50/50 owners of the LLC and that Jackson

had purportedly made a capital contribution of $150,000 to the LLC. Notably, however, the

Operating Agreement is not signed by Taylor and reflects no contribution from Taylor to the

LLC, nor any transfer of his intellectual property or any rights to the *Knight's End* or its

derivative materials to the Jackson Company.  Meanwhile, Taylor worked diligently as a

producer, director, and writer, while using his extensive network of contacts in the entertainment

industry to prepare the subsequent post-production of the *Knight's End: Intus* proof-of-concept

pilot in the late fall of 2017, despite his own significant, serious health conditions.  And he

continued promoting the series through his company, TPTFILMS.

28.     Yet, when Taylor continued promoting the *Knight's End: Intus* proof-of-concept

pilot—a project he had been working on for over 20 years—with his own production company,

TPTFILMS and associated partner group Artists of Faith, Jackson falsely accused Taylor of

cutting her out of the production.  And when Jackson failed to realize an immediate profit as an

actress and alleged producer of the project, she resorted to extortion.

29.     In fact, Jackson coveted Taylor's original series project, the *Knight's End*, and

saw it as a basis to launch a producing career.  She repeatedly requested personal contact

information for investors who supported Taylor's creative vision and demanded recognition and

copyright ownership of Taylor's original and derivative works.  But she had no such rights.

30.     On or around November 5, 2017, Taylor sent his pilot out for the editing of a

teaser trail.  Sometime thereafter between December 207 and early February 2018, Jackson

10

claimed ownership of the hard drive on which the proof-of-concept files were stores.  She

intercepted and seized physical possession of this hard drive containing all, or substantially all of

the footage from the pilot and refused to send this hard drive to Taylor so that it could be edited

and presented to his investor.

31.     Thereafter, fully aware of Taylor's ailing health, Jackson and her attorneys

threatened litigation against Taylor, sending him a cease and desist letter on December 14, 2017,

demanding that Plaintiffs shut everything down and turn over all of the *Knight's End* project

materials to her.

32.     Ultimately, Taylor was forced to share Jackson's "cease and desist" letter with

others involved in the project, and specifically a key investor, who immediately retracted a letter

of interest to be an investor in the project.  As anyone in the entertainment industry knows, a

dispute over a project's intellectual property is effectively the death knell for that project, as no

investor will extend funding to a project with serious liability regarding intellectual property

ownership.  Taylor had lost a $500,000 financial commitment in the blink of an eye, along with

sustaining serious damage to his reputation, as well as the inability to move forward with the

most important project of his life.

33.     Moreover, adding insult to injury, on or about December 26, 2017, Jackson

hacked Taylor's Google email account while he was undergoing care for his critical health

condition to gain knowledge about the project and his investors at a critical time in the life of the

project.

34.     At or around this time, on or about December 9, 2017, Jackson also commanded

control of the *Knight's End* social media accounts on Twitter and Instagram and attempted to

ransom the accounts back to Plaintiffs, the undisputed owners of the accounts, for exorbitant

sums that have no basis in any aspect of the parties' former relationship.  Conspicuously, Jackson has never once defended the lawfulness of this brazen extortion attempt.

35.     Twitter is one of the largest social networking platforms in the world.  It is particularly important for television and film creators and producers because it enables them to share news and updates about movies and shows, and to cultivate and grow a loyal, engaged audience.  Fans can subscribe or "follow" and retweet a show's tweets and can elect to receive notifications of new tweets published by the show.  According to Twitter's metrics, Twitter has more than 321 million monthly active users.

36.     Instagram is a photo and video-sharing social networking service owned by Facebook.  Similarly, Instagram allows television and film creators and producers to share news and updates about their projects with their fan base and to grow awareness about upcoming shows. Fans can like photos and videos, follow their favorite shows.  According to Instagram's metrics, the site has more than 1 billion users as of May 2019.

37.     Taylor created his social networking accounts before his relationship with Jackson.  A robust and uninhibited social media presence is vital to Taylor's success, and Taylor relies heavily on his social media accounts to generate awareness of his films and television series, and to communicate with potential investors, other artists, and supporters.

38.     During the pre-production and production of the *Knight's End* pilot, Plaintiffs generally allowed Jackson and her associate Theo Kostardis to compose tweets and posts for the project, but never once authorized Jackson to prevent Plaintiffs from posting directly or to take control of those accounts for herself or her associates.

39.     On or about December 9, 2017, Jackson and her associate Theo Kostaridis, at her direction, logged into the Twitter and Instagram Accounts and altered the account settings,

12

eliminating Taylor's administrative privileges as the owner of those accounts.  Jackson did this without Taylor's knowledge, consent, or authorization.

40.     By directing the removal of Taylor as an account administrator, Jackson prevented Plaintiffs from accessing the private administrative section of the Twitter and Instagram Account and using their administrative privileges, preventing him from using the accounts to publish tweets and posts, edit the accounts, or manage administrative roles.

41.     As a result of Jackson's seizure, Plaintiffs lost the ability to communicate directly and automatically with their family, friends and supporters who "followed" their tweets and posts, edit the pages, or manage administrative roles.

42.     Jackson did not have any right or authorization to alter the Twitter or Instagram accounts to interfere with Plaintiffs' ability to access and use their administrative privileges.

43.     By eliminating Taylor's administrative privileges, Jackson exceeded any authorization she may have previously had to access the Twitter or Instagram accounts.

44.     By eliminating Taylor's administrative privileges, Jackson obstructed Plaintiffs' ability to use the Twitter and Instagram accounts. Jackson had no right or authorization to do so.

45.     By eliminating Taylor's administrative privileges, Jackson altered and damaged the Twitter and Instagram accounts.  Plaintiffs created and configured the Twitter and Instagram Account to enable them to communicate directly with all of the family, friends and supporters who "followed," their accounts, or otherwise discovered or searched for it, and Jackson's unauthorized alterations destroyed that functionality.

46.     Jackson knew that her access to, seizure of, and damage to the Twitter and Instagram accounts was unauthorized and in excess of any authorization it may have enjoyed.

13

47.     Rather, Jackson's access to, seizure of, and damage to the Twitter and Instagram accounts was a naked attempt to obtain an unauthorized and unlawful level of control over Plaintiffs' ability to communicate with its followers, and to obtain leverage with which she could compel Plaintiffs' rightful use of their social networking accounts.

48.     At all times, Jackson was motivated not by any valid business goal, but to extort a collateral business demand to which she had no claim by preventing Plaintiffs from communicating directly with their fans through their social media accounts.

49.     On or about December 6, 2017, Plaintiffs sent a text requesting that Jackson's associate, Theo Kostaridis, restore Taylor's administrative privileged to his social media accounts.

50.     On December 28, 2017, during a call with Jackson's attorney, Buttars, Plaintiffs once again requested the return and restoration of social media accounts, but Defendants refused.

51.     Meanwhile, in January 2018, before filing a lawsuit against Taylor claiming to own his work, Jackson took complete control of the company project cloud drive and removed Taylor's intellectual property by digital force and shut him out of any shared access he had as an owner of the material.  Upon information and belief, Jackson's attorneys knowingly participated in this theft and/or knowingly received the stolen information from Jackson.

52.     Contemporaneously with her unlawful seizure of Plaintiffs' digital data, social media accounts, and email account, on or about February 14, 2018, Jackson made good on her threat and filed suit against Plaintiffs in the Court of Common Pleas, Cuyahoga County, Ohio, Case No. CV 18 892965, asserting claims for fraud, breach of contract, unjust enrichment, and tortious interference and seeking to recover her alleged investment in Taylor's work and

attempting to prevent Taylor from continuing production of the *Knight's End* without Jackson's involvement.

53.     Although Plaintiffs authored, created, and are the rightful owners of the *Knight's End* rights, Jackson and the Jackson Company held themselves out to the world as the sole and exclusive owner of the *Knight's End* copyrights and demanded that Plaintiffs purchase those rights back from Jackson.

54.     During the course of discovery in the state court action, Jackson also admitted that Taylor never signed an Operating Agreement or Articles of Incorporation for the Jackson Company. Nevertheless, she demanded that Taylor pay her an exorbitant amount in exchange for her relinquishing her rights and claims to the *Knight's End* project and its future proceeds.

55.     Jackson also admitted that she had accessed Taylor's personal email account on multiple occasions. Further, her counsel confirmed that he was in possession of the hard drive that Jackson had confiscated and that they would produce evidence of the footage on the hard drive.

56.     During the summer of 2018, Plaintiffs once again requested the return of the social media accounts and the pilot data contained on the hard drive, but Defendants refused.

57.     On October 19, 2018, Plaintiffs demanded that Jackson restore administrative privileges to their social media accounts and return and delete any emails obtained from Taylor's Gmail account.  Defendants refused to restore Taylor's access to the seized accounts and to return and delete Taylor's emails.

58.     Plaintiffs have also made multiple demands for the return of the Knight's End pilot data contained on the hard drive and the related electronic materials, on or about March 21,

15

2018, September 24, 2018, October 19, 2018, January 5, 2019, August 7, 2019, August 13, 2019, August 19, 2019, and September 13, 2019.

59.     Jackson continues to hold the *Knight's End: Intus* pilot materials and seized accounts hostage and to hold herself out as the producer and creator of the *Knight's End*.

60.     Plaintiffs had no intention of acceding to Jackson's threats, or abandoning their production of the *Knight's End* project and their responsibilities to the project's followers and supporters.  Accordingly, Plaintiffs entered into negotiations with other production companies and distributors to resume production of the project as an original streaming original production.

61.     Because Jackson continued to hold hostage of the pilot, *Knight's End* rights, and Plaintiffs' access to the Twitter and Instagram accounts, and through those sites, Plaintiffs' access to his supporters who "followed" his tweets and posts, Plaintiffs have been unable to complete production and sale of the project to any distributor.

62.     This lawsuit follows years of failed good-faith efforts to persuade Defendants to abandon their unlawful, harmful course of conduct.  Accordingly, in addition to restoration of the seized accounts, and statutory, actual, and punitive damages for the harm caused by the unlawful seizures, Plaintiffs must seek declaratory and other relief relating to the copyright interests in the *Knight's End* project.  Defendants have wrongfully asserted rights to Plaintiffs' intellectual property, violated their duties as fiduciaries of the project, and, dissatisfied with their bargain to one-day share *profits* with Plaintiffs, simply sought to extort their ill-spent *investment* from Plaintiffs through criminal means.

## FIRST CAUSE OF ACTION FOR DECLARATORY JUDGMENT AS AGAINST DEFENDANTS JACKSON AND KNIGHT'S END THE SERIES, LLC
(Copyright Act)

63.     Plaintiffs repeat, reallege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

64.     An actual controversy exists between Plaintiffs and Defendants as to whether the promotion and production of the streaming original series, *Knight's End* by Plaintiffs infringes any copyright of Defendants.

65.     Plaintiffs allege that, and Defendants deny, that, as a matter of law, Taylor exclusively created and registered the *Knight's End* work and never transferred any of his interest or rights in that work to Jackson or the Jackson Company, and, accordingly, Plaintiffs have the right in the United States to create and exploit the work without infringing any right of Defendants under copyright.

66.     Plaintiffs allege that, and Defendants deny, that, as a matter of law, the characters of the *Knight's End* the series, character traits, dialogue, settings, artifacts, story lines, and other story elements and derivative materials first appeared in the works of authorship registered exclusively by Taylor, and, accordingly, Plaintiffs have the sole right to create and exploit the work incorporating any and all of the show elements, without infringing any right of Defendants under copyright.

67.     In fact, during the course of the state court action, Jackson admitted that Taylor never signed an Operating Agreement or Articles of Incorporation for the Jackson Company, which she claims holds the rights to the *Knight's End* series and project.

17

68.     Plaintiffs are entitled to a declaratory judgment against Defendants as set forth herein above pursuant to the Copyright Law of the United States and the First Amendment to the Constitution of the United States.

## SECOND CAUSE OF ACTION AS AGAINST DEFENDANT JACKSON
(Stored Communications Act)

69.     Plaintiffs repeat, reallege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein

70.     This claim for relief arises under the Stored Communications Act, 18 U.S.C. § 2701 *et seq*.

71.     The seized data, social media and email accounts are electronic communication services within the meaning of the Stored Communications Act.

72.     As set forth above, Jackson and upon information and belief, her attorneys knowingly and intentionally accessed without authorization a facility through which an electronic communication service is provided, as follows:

a.  Jackson and, upon information and belief, her attorneys, unlawfully seized, impounded, breached and accessed a hard drive containing the Knight's End pilot materials;

b.  Jackson, and upon information and belief, her attorneys unlawfully accessed, breached, and downloaded data and the Knight's End pilot materials from Plaintiffs' cloud drive;

c.  Jackson unlawfully hacked, accessed, and breached Taylor's personal Gmail account and copied and shared emails, documents and other data stored therein; and

      d.   Jackson and her associates under her direction and control, hijacked, seized, breached, accessed, altered, and retained Plaintiffs' social media accounts on Twitter and Instagram.

73.     As set forth above, Jackson intentionally without authorization and/or in excess of an authorization accessed a facility through which an electronic communication service is provided.

74.     By their actions, Jackson obtained access to electronic communications and data while they were in electronic storage without authorization and/or in excess of her authorization.

75.     By their actions, Jackson altered Plaintiffs' access to electronic communications and data while they were in electronic storage.

76.     By their actions, Jackson prevented authorized access to electronic communications and data while they were in electronic storage.

77.     Jackson's acts were willful and intentional.

78.     Jackson's acts were unauthorized and in contravention of their obligations to Plaintiffs.

79.     By their actions, Jackson violated Plaintiffs' rights under 18 U.S.C. § 2701.

### THIRD CAUSE OF ACTION AS AGAINST ALL DEFENDANTS
(Computer Fraud and Abuse Act)

80.     Plaintiffs repeat, reallege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

81.     This claim for relief arises under 18 U.S.C. § 1030.

82.     As set forth above, Jackson and, upon information and belief, her attorneys violated 18 U.S.C. § 1030 by intentionally accessing and altering Plaintiffs' electronic data, social media accounts, and Gmail without authorization, as follows:

a. Jackson and, upon information and belief, her attorneys, unlawfully seized, impounded, breached and accessed a hard drive containing the Knight's End pilot materials;

b. Jackson, and upon information and belief, her attorneys unlawfully accessed, breached, and downloaded data and the Knight's End pilot materials from Plaintiffs' cloud drive;

c. Jackson unlawfully hacked, accessed, and breached Taylor's personal Gmail account and copied and shared emails, documents and other data stored therein; and

d. Jackson and her associates under her direction and control, hijacked, seized, breached, accessed, altered, and retained Plaintiffs' social media accounts on Twitter and Instagram.

83.     Defendants' acts were unauthorized and in contravention of their obligations to Plaintiffs.

84.     As a result of their acts, Defendants caused damage by impairing the availability of data and information, as well as certain functionalities, communications and protocols.

85.     The aggregate damage caused to Plaintiffs, including costs of recreating the *Knight's End: Intus* pilot, establishing and promoting alternate accounts, attorney's fees incurred in demanding restoration of access to the seized data, accounts, and emails, and revenues and industry goodwill lost as a result of the interrupted communications, is at least the statutory requirement of $5,000, and will continue to cost sums when the integrity of the breached drive is returned for inspection and repair.

86.     Defendants' intentional interference with Plaintiffs' access to and control of their electronic data, seized accounts, and email, and failure to restore access and control, violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and Plaintiffs are entitled to damages subject to proof at trial.

## FOURTH CAUSES OF ACTION AS AGAINST DEFENDANTS JACKSON AND KNIGHT'S END THE SERIES, LLC
(False Designation of Origin / Unfair Competition, 15 U.S.C. § 1125(a))

87.     Plaintiffs repeat, reallege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

88.     Plaintiffs are the owner of the common-law trademark rights to the *Knight's End* series and its derivative materials.  These rights are superior to any rights which Jackson and the Jackson Company may claim.

89.     Jackson and her company have, without Plaintiffs' consent, publicly used and misappropriated Plaintiffs' marks and promoted the *Knight's End* as their own.  Jackson has made false representations, false descriptions, and false designations of, or, or in connection with her alleged affiliation and production of the *Knight's End*.

90.     Upon information and belief, Jackson and the Jackson Company acted with full knowledge of Plaintiffs' use of, and statutory and common law rights to, the *Knight's End* series and derivative materials and without regard to the likelihood of confusion to the public created by their activities.

91.     Jackson and her company have deliberately and willfully attempted to trade on Plaintiffs' longstanding and hard-earned goodwill in their marks and reputation established in connection with Taylor's creation and production of the *Knight's End* television series and

derivative materials, as well as to confuse consumers as to the origin and sponsorship of the series and to pass it off as Jackson's work.

92.     Jackson's and her company's use of Plaintiffs' marks is likely to cause confusion, deception, or mistake as to the affiliation, connection or association of Jackson with the *Knight's End* series and among potential investors as to the origin, source, sponsorship, affiliation, or approval by Plaintiffs of Jackson's affiliation and promotion of the series, placing Taylor's valuable reputation and good will in the hands of Defendants.

93.     Jackson's and the Jackson Company's infringing and tortious conduct as described herein has been intentional, willful, deliberate, malicious, and intended to injure Plaintiffs, in clear disregard of Plaintiffs' legal rights.

94.     Plaintiffs have no adequate remedy at law inasmuch as money damages alone would not adequately compensate Plaintiffs for the harm to its rights, goodwill, and reputation.

95.     Defendants' acts described herein have greatly and irreparably damaged Plaintiffs and will continue to damage Plaintiffs unless enjoined by this Court.

96.     As a result of Defendants' acts, Plaintiffs have been damaged in an amount not yet determined or ascertainable.  At a minimum, however, Plaintiffs are entitled to injunctive relief, damages, and costs.  Further, considering the deliberate and malicious use and misappropriation of Plaintiffs' mark, and the need to deter Defendants from engaging in similar conduct in the future, Plaintiffs additionally are entitled to punitive damages.

### FIFTH CAUSE OF ACTION AS AGAINST DEFENDANTS JACKSON AND KNIGHT'S END THE SERIES, LLC
(Federal Trademark/Copyright Counterfeiting/Dilution)

97.     Plaintiffs repeat, reallege, and incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

98.    For decades, Plaintiffs have exclusively and continuously created, produced, and promoted and used Plaintiffs' common law trademark rights and/or copyright in the *Knight's End*.

99.    Jackson and the Jackson Company have attempted to assert credit for, designate, and promote as their own, the *Knight's End* series, which dilutes and is likely to dilute the Plaintiffs' mark by eroding the public's and investor's exclusive identification of the *Knight's End* with Plaintiffs, tarnishing and degrading the positive associations and connotations attributed with the mark through Taylor's exclusive efforts, and otherwise lessening the capacity of the mark to identify and distinguish Plaintiffs' creative works.  .

100.    Defendants have falsely promoted Jackson as the producer and/or owner of the series in connection with social media advertising, offering for sale and/or distribution the pilot and series for their own financial gain.  Plaintiffs have not authorized Defendants' use and promotion of the *Knight's End* series and derivative materials to advertise, promote, offer for sale, sell and/or distribute the pilot or series.

101.    At all relevant times, Defendants had actual and direct knowledge of Plaintiffs' prior use and ownership of the copyrights and trademarks in the *Knight's End* series. Defendants' conduct is therefore willful and reflects their intent to exploit the goodwill and professional reputation and recognition associated with Plaintiffs' creative work.

102.    Defendants' acts as described herein constitute trademark or copyright counterfeiting, blurring, and dilution in violation of 15 U.S.C. § 1125(c).

103.    Defendants' acts have caused, and will continue to cause, irreparable injury to Plaintiffs.  Plaintiffs have no adequate remedy at law and is thus damaged in an amount not yet determined.

104.     Defendants are entitled to injunctive relief, actual damages, and reasonable attorney's fees.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

a.      Declare that Defendants have unlawfully and without authorization accessed and interfered with Plaintiffs' access to the seized social media accounts and email account as pled herein;

b.      Enter an order enjoining Defendants to return the *Knight's End* pilot materials and electronic data;

c.      Enter an order enjoining Defendants to restore access to and control of the seized social media and email accounts to Plaintiffs;

d.      Enter order forbidding use of *Knight's End* marks in trade;

e.      Expedite consideration of this action pursuant to 28 U.S.C. § 1657;

f.      Declare that Defendants do not own any protectable intellectual-property interest in the *Knight's End* materials and derivative works;

g.      Declare that Plaintiffs have the right in the United States to create and exploit the *Knight's End* work and derivative works without infringing any right of Defendants under copyright;

h.      Enter an order enjoining Defendants and their agents and attorneys from further interfering with the exploitation of the *Knight's End* by Plaintiffs, including by asserting rights under copyright in and to the *Knight's End* the series and/or the *Knight's End* story elements, or by bringing ownership-based state-law claims;

24

i.      Award actual damages in the amount not less than $75,000;

j.      Award punitive damages in the amount of $1,000,000;

k.      Award statutory damages in an amount greater than $1,000 per instance of unauthorized access;

l.      Award Plaintiffs the costs of this proceeding, including reasonable attorney's fees; and

m.      Grant Plaintiffs such other and further relief as this Court deems just and proper.

Dated: December 27, 2019

Respectfully submitted,

*/s/ Christopher A. Holecek*

Christopher A. Holecek (0040840)
Jessica L. MacKeigan (0087121)
WEGMAN HESSLER
6055 Rockside Woods Boulevard, Suite 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
Facsimile: (216) 642-8826
E-Mail: caholecek@wegmanlaw.com
       jlmackeigan@wegmanlaw.com

And

Patrick S. Kabat (NY Bar 5280730)
2718 Lorain Ave., Suite 42
Cleveland, Ohio 44113-3415
Phone: (440) 279-3389
Email: patrik@poetsandpatrons.org

*Attorneys for Plaintiffs*